Edward R. Hugo [Bar No. 124839]
ehugo@HUGOPARKER.com
Bina Ghanaat [Bar No. 264826]
bghanaat@HUGOPARKER.com
HUGO PARKER, LLP
240 Stockton Street, 8th Floor
San Francisco, CA 94108
Telephone: (415) 808-0300
Facsimile:  (415) 808-0333

Attorneys for Plaintiff
MAXLITE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAXLITE, INC., a New Jersey Corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ATG ELECTRONICS, INC. and DAVID WYATT,<br><br>                    Defendants. | Case No.<br><br>VERIFIED CIVIL COMPLAINT<br><br>1. Breach of Contract;<br>2. Breach of Implied Covenant of Good Faith and Fair Dealing;<br>3. Conversion;<br>4. Breach of Fiduciary Duties of Loyalty and Confidentiality;<br>5. Tortious Interference with Contractual Relations;<br>6. Tortious Interference with Prospective Economic Relations;<br>7. Negligent Interference with Prospective Economic Relations;<br>8. Misappropriation of Trade Secrets (N.J.S.A. 56:15-1, *et seq.* and 18 U.S.C. §§ 1836 *et seq.*);<br>9. Civil Conspiracy<br><br>DEMAND FOR JURY TRIAL |

Plaintiff MaxLite, Inc., a New Jersey Corporation ("MaxLite" or "Plaintiff"), by and through its attorneys, complains of Defendants ATG ELECTRONICS, INC. and DAVID WYATT as follows:

1.     Plaintiff MaxLite is a New Jersey corporation with its principal place of business at 12 York Avenue, West Caldwell, Essex County, New Jersey 07006.

2.      Defendant David Wyatt ("Wyatt") is a citizen of the State of California. Upon information and belief, he resides at 11102 Bimini Drive, Santa Ana, California 92705. Wyatt was employed by MaxLite as VP Sales, C&I Division, Western Region from March 2010 to January 2014, and as its VP Sales, C&I Division, Pacific Southwest Region from January 2014 to April 2019. In those capacities, Wyatt worked out of MaxLite's California offices, first in Rancho Cucamonga and later in Anaheim.

3.      Defendant ATG Electronics, Inc. ("ATG") is a California corporation with its principal place of business at 9020 Rancho Park Court, Rancho Cucamonga, California 91730. ATG is, and for a number of years has been, a direct competitor of MaxLite.

4.      ATG and Wyatt are referred to herein collectively as "Defendants."

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity of citizenship), as all Defendants are citizens of states different from Plaintiff, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(1), because all defendants reside in this State and one defendant resides in this district.

7.      Venue is also proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### MaxLite

8.      Since 1993, MaxLite has engaged in the business of designing, engineering, developing, manufacturing, and distributing energy efficient

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

lighting products and technologies. For more than twenty-five years, MaxLite has invested substantial time, money, effort, and resources to develop its products, to qualify the vendors, suppliers, manufacturers, and distributors from whom it acquires the components it uses in its products, to expand its customer base, and to strengthen its business relationships, reputation, and goodwill with its distributors and customers.

9.     In the early part of this century, MaxLite focused on the development and commercialization of state-of-the-art Compact Fluorescent Lamps ("CFLs"), and currently focuses on Light Emitting Diode ("LED") lighting products and technology. MaxLite specializes in the conversion of traditional light sources into LED products and also develops new LED products and fixtures for both indoor and outdoor use and residential, commercial, and industrial applications.

10.     LED lights are solid state and highly efficient. Lamps that use LED technology require relatively little electricity and contain no mercury. As such, these bulbs are considered a "green product" and are in high demand.

11.     MaxLite has succeeded in building a stellar reputation for high quality products and services. MaxLite offers the market high-quality products that are uniquely designed and engineered by its top tier engineering talent in the U.S. and manufactured by its contract manufacturers overseas, all carefully chosen and vetted. Its products exceed the highest standards in lighting design, service, support, and technology, in part, because of its extensive product development labs, testing and testing facilities, and in-house market research.

12.     Among the key elements of MaxLite's success over the years has been its understanding of the market demand and market trends pertaining to the solid-state lighting industry as well as the close coordination between

MaxLite's contract manufacturers and its staff in Asia, operating out of China and Korea, whose main functions include engineering, sourcing and quality control.

13.     As a result of all of the foregoing, MaxLite has established itself as a clear market leader in the niche LED lighting business in the United States.

14.     This achievement has not come without hard work, dedication, significant investment in people, and the development of quality products. MaxLite has worked diligently to build and extend its market in the United States through marketing, advertising, research and development, and engineering. MaxLite has invested millions of dollars in these efforts.

15.     As one indication of the specialized niche which MaxLite occupies, its products are protected by a substantial number of utility and design patents. MaxLite currently holds 51 issued patents and 56 pending patents, in both the U.S. and abroad, covering its lighting products and technology.

16.     Furthermore, MaxLite's achievements have repeatedly been recognized by numerous industry honors and awards, including the prestigious ENERGY STAR® Partner of the Year Award, which it has been awarded five times by the U.S. Environmental Agency and the U.S. Department of Energy.

17.     MaxLite's devotion to energy efficient lamps has made it a natural partner of the Energy Star program. The Energy Star program was created in 1992 by the US Department of Energy and the US Environmental Protection Agency as a voluntary labeling program designed to promote and identify energy efficient products. For lighting applications, only lamps that meet stringent guidelines qualify to use the Energy Star logo. Given the synergies with the Energy Star program, MaxLite has worked closely with it

throughout the years. In recognition of its efforts, MaxLite has repeatedly been honored as the Energy Star Partner of the Year, in 2009, 2014, 2015, 2016, and 2017. These are just some of the many accolades that have been bestowed upon MaxLite.

18.     MaxLite's business model emphasizes assistance to current and potential customers to ensure that MaxLite's products meet the needs of their installation, and to identify relevant utility rebates and additional incentives. MaxLite offers its sales representatives and customers an extensive database of more than 2,000 utility rebates throughout the United States, covering more than 100 utilities and regions. These unique features of the MaxLite business model have only been achieved through years of research and experience and at great expense.

19.     The success and continued existence of MaxLite's business depends upon, among other things, its ability to maintain both its business relationships and the secrecy of its confidential, proprietary information which consists, among other things, of: inventions, concepts, designs, strategies, engineering data, intellectual property, product costs, product processes, production techniques, research, formulae, sales techniques, profit information, sales margins, market data and information, vendor data and information, and customer data and information.

<u>Wyatt</u>

20.     Wyatt was initially employed by MaxLite as VP Sales, C&I Division, Western Region from March 2010 to January 2014, and subsequently as VP Sales, C&I Division, Pacific Southwest Region from January 2014 to April 2019.

21.     While serving in the aforementioned capacities, Wyatt worked out of MaxLite's West Coast headquarters, first in Rancho Cucamonga,

California, and later in Anaheim, California, at 1148 Ocean Circle, Anaheim, California 92806.

22. For most of the period during which Wyatt served as Plaintiff's VP Sales, C&I Division, Pacific Southwest Region, he was the company's senior-most sales executive covering the West Coast. Between 2010 and 2014, Wyatt was responsible for managing all of MaxLite's Western Regional sales and operations covering 13 states, and between 2014 and 2019 he oversaw all aspects of the Pacific Southwest Region (California, Arizona, New Mexico, Nevada, and Hawaii) related to sales, including key customer and agency relationships, product development and sourcing, and marketing. He was responsible for all product lines, including indoor, outdoor, lamps and controls, and for managing all of MaxLite's Western Regional sales rep agencies and the majority of its Commercial-and-Industrial-channel customers, involving more than tens of millions of dollars in sales each year.

23. Prior to accepting his position at MaxLite, Wyatt was aware that his employment with MaxLite would result in his having access to MaxLite's confidential and proprietary information, including, but not limited to, sales information and techniques, sourcing information and strategy, revenue data, profit information, product costs, sales margins, strategies, market data, and customer and pricing data.

24. Wyatt's employment at MaxLite was expressly conditioned upon his entering into a written Proprietary Information Agreement, dated February 23, 2010, with MaxLite (the "Proprietary Agreement") which, among other things, required Wyatt to maintain confidentiality of MaxLite's information, trade secrets, and proprietary business information.

25. After execution of the Proprietary Agreement, Wyatt had access to, fully acquainted himself with, and was integrally involved in the development of, some of the most sensitive aspects of MaxLite's

confidential, proprietary information, including, but not limited to, MaxLite's customer base, sales techniques, sourcing strategy, revenue and profit information, product costs, sales margins, strategies, market data, and customer data, all of which are fundamental to MaxLite's business and are regarded and maintained as proprietary and confidential information.

26.     Wyatt entered into a revised Proprietary Information and Non-Competition Agreement on April 17, 2015 (the "Second Proprietary Agreement").

27.     The Second Proprietary Agreement provided similar protections to MaxLite's confidential and proprietary information, its business relationships, and its customers.

28.     On April 19, 2019, MaxLite terminated Wyatt's employment pursuant to a Separation and Release Agreement (the "Separation Agreement"), which Wyatt signed on April 22, 2019. A true and correct copy of the Separation Agreement is attached hereto as **Exhibit A**.

29.     In consideration for entering into the Separation Agreement, Wyatt was paid the sum of $37,500, representing ten (10) weeks of his salary at MaxLite. Wyatt was not entitled to any payment upon his separation from employment at MaxLite and received the aforementioned amount solely in consideration of Wyatt's entering into the Separation Agreement and agreeing to the terms thereof, including the restrictive covenants contained therein.

30.     The Separation Agreement provides, in pertinent part, as follows (emphasis added):

8.  **<u>Confidential Information</u>**. You agree and acknowledge that you will not (i) retain or use for the benefit, purposes or account of you or any other person, organization or entity; or (ii) disclose, divulge, reveal, communicate, share, transfer or provide access

to any person, organization or entity other than the Company: any non-public, proprietary or confidential information – including, without limitation, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, employees, consultants, vendors, suppliers, compensation, benefits, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals – concerning the past, current or planned business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis ("Confidential Information") without the prior written authorization of the Company. Confidential Information shall not include any information that is (a) generally known to the industry or the public other than as a result of your breach of this covenant or any breach of other confidentiality obligations by third parties; (b) made legitimately available to you by a third party without breach of any confidentiality obligation; or (c) required by law to be disclosed; provided that you shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and cooperate with any attempts by the Company to obtain a protective order or similar treatment.

9. **<u>Non-Solicitation of Company's Employees and Agents.</u>** You agree that, for a period of one year following the Separation

Date, you shall not employ or solicit for employment, or assist another in employing or soliciting for employment, any person who is then, or was at any time following the Separation Date, an employee, consultant or agent of the Company.

11. **Remedies**. You acknowledge that this Agreement, its terms and your compliance are necessary to protect the Company's Confidential Information (as defined above), its business and its goodwill; and that a breach of any of your promises contained in this Agreement will irreparably and continually damage the Company to an extent that money damages may not be adequate to address. For these reasons, **you agree that in the event of a breach or a threatened breach by you of this Agreement, the Company shall be entitled to a temporary restraining order and preliminary injunction restraining you from such breach**. Nothing contained in this provision shall be construed as prohibiting the Company from pursuing any other remedies available for such breach or threatened breach or any other breach of this Agreement. **You also agree to pay all reasonable attorneys' fees and court costs, if any, incurred by the Company in attempting to enforce the terms of this Agreement, including without limitation, attorneys' fees and costs incurred before the Company resorts to an action in Court.**

15. **Legal Advice, Reliance**. You represent and acknowledge: (i) that you have been allowed adequate time, of at least twenty-one (21) calendar days, to consider this letter agreement (which, by signing this letter agreement prior to the expiration of such period, you have expressly agreed to waive); (ii) that you have been advised to consult with an attorney, and discuss all aspects

of this letter agreement, before you decide whether to sign it; (iii) that you have carefully read and fully understand all the provisions of this letter agreement; (iv) that you have voluntarily entered into this letter agreement, without any pressure, duress or coercion; and (v) that you have not previously assigned or transferred or purported to assign or transfer, to any person or entity, any of the claims described in Section 7 hereof, any portion thereof, or any interest therein.

16. **Non-Disclosure of this Agreement**. By signing this Agreement, you represent that you have not disclosed, and agree not to disclose in the future, any of its terms to any person at any time, provided that this paragraph shall not be construed to prohibit such disclosure as may be required by law, or in a proceeding to enforce the terms and conditions of this Agreement, or pursuant to your professional obligations.

18.f. **Governing Law; Severability**. This letter agreement will be **governed by the laws of the State of New Jersey**, without regard to its conflict of laws rules. In the event that any one or more of the provisions of this letter agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby. The parties hereto agree that the covenants set forth in this letter agreement are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants as to the court shall

appear not reasonable and to enforce the remainders of these covenants as so amended.

31.    Wyatt consulted with an attorney regarding his Separation Agreement, and, on the advice of counsel, sought clarification of said agreement from MaxLite because "my counselor felt we should get it in writing." A true and correct copy of this e-mail chain is attached hereto as **Exhibit F**.

32.    On or about April 29, 2019, Wyatt sought employment with ATG, and, upon information and belief, Wyatt commenced employment with ATG shortly thereafter.

33.    Upon information and belief, since joining ATG, Wyatt has been serving as its head of sales.

34.    Upon information and belief, Wyatt's work, duties, and responsibilities in his current position with ATG are identical, or substantially similar to, his prior position at, and duties and responsibilities for MaxLite.

35.    Upon information and belief, shortly after commencing to work for ATG, on or about May 28, 2019, Wyatt created a sales representative agency under the name of NextGen LED Reps LLC. Upon information and belief, Wyatt did so in order to mask his connection to ATG and create the illusion of being an independent contractor.

36.    As indicated above, Wyatt and ATG were engaged in discussions concerning his employment opportunities with ATG at least as early as April 2019; during those discussions, Wyatt referenced his inside knowledge relating to many MaxLite projects and suggested that he could use the confidential and proprietary information he had learned while at MaxLite for the benefit of ATG.

37.     Upon information and belief, Wyatt is currently working for ATG while in possession of MaxLite's confidential, proprietary information that he acquired during his employment with MaxLite and is soliciting business from current customers, distributors, and manufacturers of MaxLite based upon and through the use of this confidential information, including, but not limited to: Long Beach (CA) Unified School District ("LBUSD") lighting projects, Pacific Gas & Electric ("PG&E") utility rebate business, and ALOM Technologies, in violation of the Separation Agreement.

38.     Upon information and belief, Wyatt has used MaxLite's confidential, proprietary information, including price lists and bidding strategies, product information, and customer specific sales and project information, as well as customer lists in an effort to divert business from MaxLite through the use of MaxLite's confidential information and to the benefit of ATG in violation of the Separation Agreement.

39.     MaxLite is informed and believes that shortly before Wyatt left MaxLite's employ, he accessed MaxLite's confidential, proprietary information that is contained on MaxLite's "SM-100" internal financial/product/sales program, which is available only to MaxLite personnel and requires a valid login and password.

40.     MaxLite is informed and believes that at that time, Wyatt accessed and downloaded a large volume of MaxLite customer information including but not limited to information concerning sales volumes, sales margins, product pricing, customers' purchasing histories and plans, sales terms, product specifications for particular projects and customers, utility rebate information, vendor information, and specific lighting projects.

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

ATG

41.    Since at least 2013, ATG has consistently and persistently sought to gain a competitive advantage in the niche LED lighting marketplace in which it competes directly with MaxLite by directly targeting and contacting MaxLite's employees, customers, suppliers, distributors, vendors, and sales representatives.

42.    ATG directly competes with and against MaxLite in the United States, including in the State of California.

43.    As set forth in more detail below, ATG's track record includes its repeated improper targeting of key MaxLite personnel in an effort to exploit the confidential and proprietary information in their possession concerning MaxLite, learned by such personnel while employed at MaxLite. Indeed, some seven years ago, ATG unsuccessfully attempted to solicit Wyatt to leave MaxLite and come to work for ATG.

44.    In late 2014, when unable to gain an advantage over MaxLite through proper legal means, ATG stole MaxLite's confidential and proprietary information, which it obtained by hiring and contracting with former MaxLite employees, and by utilizing MaxLite's information in these former employees' possession, all in knowing violation of the agreements signed by said employees with MaxLite. At that time, ATG hired and contracted with former MaxLite employee James D. Steedly ("Steedly") – who was introduced to ATG by Wyatt. In turn, Steedly induced former MaxLite employees, Sophia C. Galleher ("Galleher"), and Matthew Kim ("Kim") (collectively, with Steedly, "N.J. defendants") to leave MaxLite and join ATG.

45.    ATG's tortious actions vis-à-vis the N.J. defendants is the subject of a pending lawsuit in the United States District Court for the District of New Jersey, which is styled as *MaxLite, Inc. v. ATG Electronics, Inc., James D.*

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

*Steedly, Sophia C. Galleher and Matthew Kim*, Civil Action No. 2:15-CV-01116-SDW-SCM ("N.J. Action").[1]

46.     Based on documents produced in the N.J. Action, Yaxi (Nick) Ni ("Ni"), President and majority shareholder of ATG, and Art Tapia ("Tapia"), former President of ATG (and, upon information and belief, current North American Sales Manager of ATG), began to solicit Wyatt to work for ATG in 2013. Wyatt met with Ni and Steedly, and, on August 4, 2013, Ni sent an e-mail to Wyatt and Steedly, stating in relevant part, "If you guys join me, handling US product and sales, I focus on handling supply side, we can make the company to the $50 million range and take it to NASDAQ in a few years…[¶]…I see you guys as very good partners for this business. Let's think on it and see if a good arrangement can be made, and we act on it when we all see time is right." (see exhibits at N.J. Action ECF Doc. No. 202-3, attached hereto as **Exhibit B**.) On August 5, 2013, Wyatt responded in relevant part that he "would like to hear more about equity positions and how we would take the Company to the investment community when we reach the designated annual revenue." (*Ibid.*) Ni replied to Wyatt and Steedly, asking to set up a meeting the next day. (*Ibid.*)

---

[1] MaxLite hereby discloses the existence of the N.J. Action and that it is *not* filing a "Notice of Pendency of Other Actions or Proceedings" pursuant to L.R. 83-1.4.1 because the instant matter does *not* "involve[ ] all or a material part of the subject matter of" the N.J. Action. Notably: (1) defendant Wyatt, a California resident, is not a party to the N.J. Action; (2) MaxLite's contract-based claims herein arise from Wyatt's Separation Agreement; (3) MaxLite's contract-based claims in the N.J. Action arise from the N.J. defendants' Proprietary Information Agreements; (4) MaxLite's contract-based claims herein arise from Wyatt's breach of "**Confidential Information**," "Non-Solicitation," and "**Non-Disclosure**" provisions; (5) MaxLite's contract-based claims in the N.J. Action arise from the N.J. Defendants' breach of "**Non-Compete**" and "Non-Solicitation" provisions; (6) MaxLite's claims herein will require interpretation and application of the federal trade secret statutes (18 U.S.C. §§ 1836 *et seq.*), which is not at issue in the N.J. Action; and (7) as noted in paragraphs 52 and 53 *infra*, **the instant suit seeks to immediately preclude Wyatt from communicating with ATG regarding his knowledge of MaxLite's internal litigation strategy against ATG in the N.J. Action.**

47.     During Wyatt's meetings and communications with Ni, Wyatt expressed concerns over the non-compete provisions in his Proprietary Agreement with MaxLite. Ni paid to have Wyatt's contract reviewed by a New Jersey lawyer.

48.     On August 11, 2013, Ni sent an e-mail to Wyatt and Steedly, saying it was "great we met yesterday," and advising Wyatt and Steedly to "have yor [sic] contract checked out; making the move at end of 2013 or beginning of next year would be great timing." (see exhibits at N.J. Action ECF Doc. No. 202-3, attached hereto as **Exhibit C**.)

49.     On August 20, 2013, Wyatt sent an e-mail to Ni with his "agreement," which was Wyatt's Proprietary Agreement. (see exhibits at N.J. Action ECF Doc. No. 202-3, attached hereto as **Exhibit D**.) On August 22, 2013, Ni e-mailed Wyatt about sending Wyatt a check and "get[ting] the opinion from the New Jersey lawyers first." (*Ibid.*) On September 4, 2013, Wyatt e-mailed Ni to advise that he had signed the retainer and sent the check for $1,500 to the New Jersey attorney. (*Ibid.*)

50.     Wyatt thereafter sent the opinion of the New Jersey attorney to Ni, which was that Wyatt's Proprietary Agreement should not be an issue. However, ultimately, Wyatt did not join ATG in August 2013.

51.     Although Wyatt did not join ATG in 2013, based on documents recently produced in the N.J. Action, after Wyatt left MaxLite on April 19, 2019, ATG began to engage in unfair competition by, among other things, tortiously interfering with MaxLite's successful business, through the theft of MaxLite's confidential and proprietary information, which it obtained by hiring and contracting with Wyatt, and by utilizing MaxLite's information in Wyatt's possession, in violation of the Separation Agreement.

52.     In addition to being an identified fact witness in the N.J. Action, Wyatt was involved in and has knowledge about MaxLite's internal

litigation strategy and confidential discussions regarding the case against ATG and in New Jersey. Wyatt was involved in several litigation strategy discussions at MaxLite and has specific, confidential information about the N.J. Action against the very company for whom he is now working.

53.     ATG concedes that it has had recent communications with Wyatt, that it is in possession of Wyatt's communications with MaxLite, and is in possession of MaxLite's Separation Agreement with Wyatt as well as direct emails between MaxLite and Wyatt regarding same. (See Dkt. 287 from the N.J. Action, attached as **Exhibit E**.)

54.     ATG conspired with Wyatt to steal MaxLite's proprietary information and use it to interfere with MaxLite's business relationships and contacts.

55.     As alleged above, within approximately 10 days of Wyatt's separation from MaxLite on April 19, 2019, Wyatt and ATG began communicating about specific MaxLite projects regarding which Wyatt had inside knowledge.

56.     As indicated above, Wyatt e-mailed Ni on April 29, 2019, suggesting that he would bring over MaxLite business to ATG, including the LBUSD project.

57.     MaxLite was informed that, among other things, Wyatt and ATG specifically targeted MaxLite's largest single customer, ALOM Technologies, Inc., which purchased from MaxLite approximately $30,000,000 worth of products since 2017 under the PG&E contractor rebate program. MaxLite was further informed that Wyatt improperly transferred to ATG highly confidential information concerning pricing, sales margins, specific product mix and the specifications unique to the ALOM/PG&E program, contract manufacturer information, and unique sales knowhow that had led ALOM to choose MaxLite over other suppliers since 2017.

58.    MaxLite was also informed that in or about January 2020, ATG contacted the MaxLite contract manufacturer, located in China, which had supplied all of the products which MaxLite had sold to ALOM under the ALOM/PG&E program. MaxLite was further informed that ATG suggested they supply these products to ATG using a different factory name and that ATG would use a different customer name, all in an effort to conceal the fact that ATG was trying to steal more than $30M worth of business from the largest MaxLite customer.

59.    On May 9, 2019, Wyatt, in violation of the confidentiality provisions of his Separation Agreement, e-mailed Eric Cai ("Cai") of ATG not only a full copy of his Separation Agreement, but also his e-mail exchanges with MaxLite regarding the Separation Agreement.

60.    Aware that his working for ATG might be improper, Wyatt attempted to disguise his employment status with ATG through the creation of an illusory "rep agency" or "independent contractor" relationship. This thinly veiled attempt at manipulating his true role with ATG does nothing more than confirm Wyatt's nefarious intentions.

61.    In addition, towards the end of May 2019, MaxLite is informed and believes that Wyatt suggested to Ni that he might form a "Loan-Out corporation" to further distance himself from being a direct ATG employee.

62.    After becoming employed by and/or having contracted with ATG, Wyatt engaged in conduct prohibited under the terms of the Separation Agreement, including, but not limited to, the transfer of MaxLite's confidential and proprietary information to ATG.

63.    ATG impermissibly used information garnered from Wyatt, which ATG knew to be confidential and proprietary to MaxLite, to gain an unfair advantage over MaxLite by, among other things, utilizing MaxLite's customer lists, price lists, recent research and technology development,

relationships, and other proprietary information on existing contracts to solicit business, all in violation of what ATG knew or recklessly disregarded to be in violation of the Separation Agreement.

64.     ATG has benefitted from the unlawful practices aforesaid of Wyatt by gaining what it knew to be knowledge about MaxLite's product research and development, pricing of purchases and sales, rebates, customer lists, vendor and distributor information, and other confidential, proprietary information through the information imparted to it and used for its benefit by Wyatt in violation of the Separation Agreement.

65.     ATG has impermissibly used MaxLite's confidential and proprietary information, which it obtained from Wyatt, to target MaxLite's customers, vendors, distributors, and suppliers, including, but not limited to: LBUSD lighting projects, PG&E utility rebate business, and ALOM Technologies. ATG, while in possession of MaxLite's confidential and proprietary information, has also been contacting MaxLite's customers, vendors, distributors, and suppliers, including, but not limited to: LBUSD, PG&E, and ALOM Technologies. ATG has exploited MaxLite's confidential, proprietary information with respect to the aforementioned customers, which it obtained from Wyatt. This information includes, but is not limited to, the following: product lists, design requests, design specifications, current and pending contracts, and price lists.

66.     As a result of using Wyatt's confidentially obtained MaxLite information, ATG has: (a) solicited, suborned, and/or conspired in violation of the Separation Agreement; (b) tortiously interfered with MaxLite's contractual rights under the Separation Agreement; (c) tortiously interfered with MaxLite's prospective economic advantages, and business relations with its suppliers, vendors, customers, and contractors; and (d) engaged in theft of trade secrets, civil conspiracy, and unfair competition through the

use of MaxLite's confidential, proprietary information in the possession of Wyatt in violation of the Separation Agreement.

<u>FIRST CLAIM FOR BREACH OF CONTRACT</u>

<u>(Against Wyatt)</u>

67.    Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

68.    By virtue of his aforesaid conduct, Wyatt has breached various provisions of his valid and binding Separation Agreement, including, but not limited to, Sections 8, 9, and 16.

69.    As a result of the breaches of Wyatt's Separation Agreement, Plaintiff has sustained, and will continue to sustain in the future, substantial and irreparable harm and loss not adequately compensable at law or in damages, including, but not limited to, loss of goodwill, harm to business reputation, intellectual property infringement, loss of the right to sell a unique product, presence of unfair competition, and loss of market share, unless such breaches are enjoined and restrained.

**WHEREFORE**, Plaintiff respectfully requests Judgment against Wyatt on the First Claim as follows:

A. For all remedies available pursuant to Section 11 of the Separation Agreement, which include, but are not limited to: (1) a temporary restraining order and preliminary injunction in the event of a breach or a threated breach by Wyatt of the Separation Agreement; and (2) all reasonable attorneys' fees and court costs incurred by Plaintiff in attempting to enforce the terms of the Separation Agreement, including without limitation, attorneys' fees and costs **incurred before Plaintiff filed this action**;

B. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

C. Pre- and post-judgment interest;

D. For temporary, preliminary and permanent injunctive relief enjoining Wyatt from disclosing or using MaxLite's trade secrets, confidential and proprietary information, and customer data, and requiring Wyatt to return to MaxLite all documents memorializing any of MaxLite's trade secrets or confidential and proprietary information, and to identify and return to MaxLite all proprietary information and/or customer data and all intellectual property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

E. As the above-referenced conduct of Wyatt was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

F. Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

G. For costs of suit; and

H. Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

## SECOND CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Wyatt)

70.     Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

71.     There exists in every contract an implied covenant of good faith and fair dealing, which means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. It means being faithful to one's duty or obligation.

72.     The conduct and activities aforesaid of Wyatt constitute a breach of the implied covenant of good faith and fair dealing in that Wyatt received employment with MaxLite and confidential, proprietary information, which Wyatt utilized in a manner inconsistent with, and violative of, his Separation Agreement, including in manners harmful to MaxLite.

**WHEREFORE**, Plaintiff respectfully requests Judgment against Wyatt on the Second Claim as follows:

A. For all remedies available pursuant to Section 11 of the Separation Agreement, which include, but are not limited to: (1) a temporary restraining order and preliminary injunction in the event of a breach or a threated breach by Wyatt of the Separation Agreement; and (2) all reasonable attorneys' fees and court costs incurred by Plaintiff in attempting to enforce the terms of the Separation Agreement, including without limitation, attorneys' fees and costs **incurred before Plaintiff filed this action**.

B. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

C. Pre- and post-judgment interest;

D. For temporary, preliminary and permanent injunctive relief enjoining Wyatt from disclosing or using MaxLite's trade secrets, confidential and proprietary information, and customer data, and requiring Wyatt to return to MaxLite all documents memorializing any of MaxLite's trade secrets or confidential and proprietary information, and to identify and return to MaxLite all proprietary information and/or customer data and all intellectual property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

E. As the above-referenced conduct of Wyatt was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

F. Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

G. For costs of suit; and

H. Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

<u>THIRD CLAIM FOR CONVERSION</u>

(Against Wyatt)

73. Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

74.     MaxLite has the right to immediate possession of its trade secrets, confidential and proprietary information, and customer data, and all documents memorializing any of MaxLite's trade secrets or confidential and proprietary information, and all proprietary information and/or customer data and all property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

75.     Wyatt has wrongfully interfered with MaxLite's right to immediate possession of its intellectual property and confidential, proprietary information.

76.     The actions and conduct aforesaid of Wyatt were willful, wanton, and malicious and constitute a conversion and misappropriation of MaxLite's confidential proprietary information, including, but not limited to, customer data.

77.     As a result of Wyatt's actions and conduct aforesaid, Plaintiff has suffered, and will continue to suffer, substantial and irreparable harm, and loss, which cannot be adequately compensated by damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against Wyatt on the Third Claim as follows:

A. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

B. Pre- and post-judgment interest;

C. For temporary, preliminary and permanent injunctive relief enjoining Wyatt from disclosing or using MaxLite's trade secrets, confidential and proprietary information, and customer data, and requiring Wyatt to return to MaxLite all documents memorializing

any of MaxLite's trade secrets or confidential and proprietary information, and to identify and return to MaxLite all proprietary information and/or customer data and all intellectual property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

D. As the above-referenced conduct of Wyatt was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

E. Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

F. For costs of suit; and

G. Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

## FOURTH CLAIM FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND CONFIDENTIALITY

### (Against Wyatt)

78.    Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

79.    An agent, such as a high-level supervisor or manager, owes a fiduciary duty to his or her principal. A fiduciary duty imposes on the agent a duty to act with the utmost good faith in the best interests of his or her principal.

80.    "Fiduciary duty" includes a duty of undivided loyalty. Wyatt, as a high-level supervisor and/or manager owed his principal, MaxLite, his

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

undivided loyalty. In violation of said duty, Wyatt acted against MaxLite's interests by using MaxLite's confidential and proprietary information to solicit MaxLite's customers, suppliers, vendors, manufacturers, and distributors to transfer their business to ATG, a competitor of MaxLite.

81.     An agent also has a duty not to use confidential, proprietary information to an employer's detriment given to the employee in furtherance of the employer's interest or if wrongfully acquired.

82.     Wyatt removed confidential, proprietary information while still employed by MaxLite for the purpose of soliciting MaxLite's customers, suppliers, vendors, manufacturers, and distributors. Furthermore, once hired by ATG, Wyatt has utilized his knowledge of MaxLite's confidential, proprietary information, for the benefit of ATG and to the detriment of MaxLite.

83.     Furthermore, as noted above, Wyatt was involved in and has knowledge about MaxLite's internal litigation strategy and confidential discussions regarding the case against ATG and in New Jersey. Wyatt was involved in several litigation strategy discussions at MaxLite and has specific, confidential information about the N.J. Action against the very company for whom he is now working.

84.     ATG concedes that it has had recent communications with Wyatt, that it is in possession of Wyatt's communications with MaxLite, and is in possession of MaxLite's confidentiality and non-solicitation agreement with Wyatt. (See Dkt. 287 from the N.J. Action, attached as **Exhibit E**.)

85.     The conduct and actions aforesaid of Wyatt constitute acts of unfair competition and breaches of his fiduciary duty, which he owed to MaxLite.

86.     As a result of Wyatt's acts of unfair competition and breaches of his duties aforesaid, Plaintiff has suffered, and will continued to suffer, substantial damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against Wyatt on the Fourth Claim as follows:

A. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

B. Pre- and post-judgment interest;

C. For temporary, preliminary and permanent injunctive relief enjoining Wyatt from disclosing or using MaxLite's trade secrets, confidential and proprietary information, and customer data, and requiring Wyatt to return to MaxLite all documents memorializing any of MaxLite's trade secrets or confidential and proprietary information, and to identify and return to MaxLite all proprietary information and/or customer data and all intellectual property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

D. Ordering that Wyatt disgorge or forfeit the compensation paid by MaxLite to him during the time period that he breached his fiduciary duties to MaxLite;

E. As the above-referenced conduct of Wyatt was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

F. Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

1   G. For costs of suit; and

2   H. Awarding such other and further relief as is deemed equitable,

3       appropriate, and just by this Court.

4   <u>FIFTH CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL</u>

5   <u>RELATIONS</u>

6   (Against All Defendants)

7       87.    Plaintiff hereby repeats, realleges, and incorporates each and

8   every allegation contained in the above paragraphs of the Complaint as

9   though fully set forth at length herein.

10       88.    Tortious interference with contractual relations exists where

11   there is:   (1) actual interference with a contract; (2) the interference was

12   inflicted intentionally by a defendant who is not a party to the contract; (3)

13   the interference was without justification; and (4) the interference caused

14   damage.

15       89.    ATG has, without justification, induced and/or facilitated Wyatt

16   to breach his Separation Agreement with MaxLite. ATG has also interfered

17   with MaxLite's contracts with its vendors, suppliers, manufacturers,

18   customers, sales representatives and distributors through the use of

19   improperly obtained confidential and proprietary information and through

20   the use and assistance of persons whose conduct in doing so violates

21   agreements to which they are bound.

22       90.    Wyatt has, without justification, interfered with MaxLite's

23   contracts with its vendors, suppliers, manufacturers, customers, sales

24   representatives, and distributors.

25       91.    The actions and conduct aforesaid of ATG and Wyatt were

26   intentional and constitute tortious interference with contractual relations

27   between MaxLite and its employees, vendors, suppliers, manufacturers,

28   customers, sales representatives and distributors.

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

92.    As a result of ATG's and Wyatt's tortious interference with MaxLite's contractual relations, Plaintiff has suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against each of the Defendants on the Fifth Claim as follows:

A. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

B. Pre- and post-judgment interest;

C. Temporarily, preliminarily, and permanently restraining Wyatt from violating the terms of his Separation Agreement.

D. Temporarily, preliminarily, and permanently restraining ATG from participating in violation of the Separation Agreement.

E. Temporarily, preliminarily, and permanently restraining ATG from using MaxLite's confidential and proprietary information to interfere in MaxLite's contractual relationships with its vendors, customers, suppliers, manufacturers, distributors, and employees;

F. Temporarily, preliminarily, and permanently restraining Wyatt from using MaxLite's confidential and proprietary information to interfere in MaxLite's contractual relationships with its vendors, customers, suppliers, manufacturers, distributors, and employees;

G. Temporarily, preliminarily, and permanently restraining each Defendant from using, disclosing, or disposing of any of MaxLite's confidential, proprietary information and customer data;

H. Compelling each Defendant to identify and return to MaxLite all proprietary information and/or customer data and all property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his or

her possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

I.  As the above-referenced conduct of Defendants was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

J.  Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

K.  For costs of suit; and

L.  Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

## SIXTH CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (Against All Defendants)

93.    Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

94.    MaxLite has a right to pursue its business free from undue influence or molestation by ATG or Wyatt.

95.    ATG has, without justification, interfered with MaxLite's contracts with its vendors, suppliers, manufacturers, customers, sales representatives and distributors through the use of improperly obtained confidential and proprietary information and through the use and assistance of persons whose conduct in doing so violates agreements to which they are bound.

96.    Wyatt has, without justification, interfered with MaxLite's contracts with its vendors, suppliers, manufacturers, customers, sales representatives, and distributors through the use of MaxLite's confidential and proprietary information.

97.    The actions and conduct aforesaid of ATG and Wyatt were intentional and constitute tortious interference with prospective economic relations between MaxLite and its employees, vendors, suppliers, manufacturers, customers, sales representatives and distributors.

98.    As a result of ATG's and Wyatt's tortious interference with MaxLite's prospective economic relations, Plaintiff has suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against each of the Defendants on the Sixth Claim as follows:

A. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

B. Pre- and post-judgment interest;

C. Temporarily, preliminarily, and permanently restraining Wyatt from violating the terms of his Separation Agreement.

D. Temporarily, preliminarily, and permanently restraining ATG from participating in violation of the Separation Agreement.

E. Temporarily, preliminarily, and permanently restraining ATG from using MaxLite's confidential and proprietary information to interfere in MaxLite's prospective economic relations with its vendors, customers, suppliers, manufacturers, distributors, and employees;

F. Temporarily, preliminarily, and permanently restraining Wyatt from using MaxLite's confidential and proprietary information to interfere in MaxLite's prospective economic relations with its vendors, customers, suppliers, manufacturers, distributors, and employees;

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

G. Temporarily, preliminarily, and permanently restraining each Defendant from using, disclosing, or disposing of any of MaxLite's confidential, proprietary information and customer data;

H. Compelling each Defendant to identify and return to MaxLite all proprietary information and/or customer data and all property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his or her possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

I. As the above-referenced conduct of Defendants was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

J. Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

K. For costs of suit; and

L. Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

## SEVENTH CLAIM FOR NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (Against All Defendants)

99.     Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

100.   Defendants owed a duty of care to take reasonable measures to avoid the risk of causing economic damages to MaxLite that Defendants knew, or had reason to know, MaxLite was likely to suffer from their conduct.

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

101.   In violation of this duty, ATG has, without justification, interfered with MaxLite's contracts with its vendors, suppliers, manufacturers, customers, sales representatives and distributors through the use of improperly obtained confidential and proprietary information and through the use and assistance of persons whose conduct in doing so violates agreements to which they are bound.

102.   Wyatt has, without justification, interfered with MaxLite's contracts with its vendors, suppliers, manufacturers, customers, sales representatives, and distributors through the use of MaxLite's confidential and proprietary information.

103.   The actions and conduct aforesaid of ATG and Wyatt constitute tortious interference with prospective economic relations between MaxLite and its employees, vendors, suppliers, manufacturers, customers, sales representatives and distributors.

104.   As a result of ATG's and Wyatt's tortious interference with MaxLite's prospective economic relations, Plaintiff has suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against each of the Defendants on the Seventh Claim as follows:

A. For nominal damages, compensatory damages, consequential and incidental damages, and actual damages, according to proof;

B. Pre- and post-judgment interest;

C. Temporarily, preliminarily, and permanently restraining Wyatt from violating the terms of his Separation Agreement.

D. Temporarily, preliminarily, and permanently restraining ATG from participating in violation of the Separation Agreement.

E. Temporarily, preliminarily, and permanently restraining ATG from using MaxLite's confidential and proprietary information to

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

32

VERIFIED COMPLAINT

interfere in MaxLite's prospective economic relations with its vendors, customers, suppliers, manufacturers, distributors, and employees;

F.  Temporarily, preliminarily, and permanently restraining Wyatt from using MaxLite's confidential and proprietary information to interfere in MaxLite's prospective economic relations with its vendors, customers, suppliers, manufacturers, distributors, and employees;

G.  Temporarily, preliminarily, and permanently restraining each Defendant from using, disclosing, or disposing of any of MaxLite's confidential, proprietary information and customer data;

H.  Compelling each Defendant to identify and return to MaxLite all proprietary information and/or customer data and all property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his or her possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

I.  Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

J.  For costs of suit; and

K.  Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

## EIGHTH CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS

### (N.J.S.A. 56:15-1 *et seq.* and 18 U.S.C. §§ 1836 *et seq.*)

### (Against All Defendants)

105.  Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

106.  As described above, MaxLite is the owner of various confidential, proprietary information, which consist of, among other things,: inventions, concepts, designs, strategies, engineering data, intellectual property, product costs, product processes, production techniques, research, formulae, sales techniques, profit information, sales margins, market data, vendor data, and customer data. The foregoing confidential, proprietary information were trade secrets at the time of their misappropriation by Wyatt and usage by ATG.

107.  Wyatt improperly acquired said trade secrets from MaxLite upon the termination of his employment, and, thereafter, disclosed said trade secrets to ATG, which ATG thereafter used.

108.  The actions and conduct aforesaid of Defendants were willful, malicious, oppressive, and fraudulent, and constitute a misappropriation of MaxLite's trade secrets, including, but not limited to, customer data.

109.  As a result of Defendants' actions and conduct aforesaid, Defendants were unjustly enriched.

110.  Defendants' actions and conduct aforesaid were a substantial factor in causing Defendants' unjust enrichment and causing Plaintiff to suffer, and continue to suffer, substantial and irreparable harm, and loss, which cannot be adequately compensated by damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against Defendants on the Eighth Claim as follows:

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

A. For nominal damages, compensatory damages, consequential and incidental damages, actual damages, and lost profits, according to proof;

B. Pre- and post-judgment interest;

C. For temporary, preliminary and permanent injunctive relief enjoining Wyatt from disclosing or using MaxLite's trade secrets, confidential and proprietary information, and customer data, and requiring Wyatt to return to MaxLite all documents memorializing any of MaxLite's trade secrets or confidential and proprietary information, and to identify and return to MaxLite all proprietary information and/or customer data and all intellectual property, including, but not limited to, all correspondence, memoranda, reports, notebooks, customer lists, pricing lists, research and development, product samples, and all other documents, in his possession, custody or control which were obtained by Defendants as a result of Wyatt's employment with MaxLite;

D. As the above-referenced conduct of Defendants was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

E. Awarding reasonable attorneys' fees, expenses, and costs incurred in bringing this action;

F. For costs of suit; and

G. Awarding such other and further relief as is deemed equitable, appropriate, and just by this Court.

## NINTH CLAIM FOR CIVIL CONSPIRACY

### (Against All Defendants)

111.   Plaintiff hereby repeats, realleges, and incorporates each and every allegation contained in the above paragraphs of the Complaint as though fully set forth at length herein.

112.   Defendants conspired and agreed with each other, in a common plan to perpetrate and commit, breach of contract, breach of implied covenant of good faith and fair dealing, conversion and misappropriation, tortious interference of contractual relations and present and prospective business advantage, unfair competition, and breach of fiduciary duty, upon MaxLite.

113.   Wyatt and ATG also conspired to acquire, utilize, and convert confidential, proprietary information from MaxLite for the benefit of ATG, Wyatt's new employer and direct competitor of MaxLite, and to the detriment of MaxLite.

114.   The actions and conduct aforesaid of the Defendants were willful, wanton, and malicious and constitute civil conspiracy.

115.   As a result of Defendants' civil conspiracy, Plaintiff has suffered, and will continue to suffer, substantial special damages.

**WHEREFORE**, Plaintiff respectfully requests Judgment against each of the Defendants on the Ninth Claim as follows:

    A. For nominal damages, compensatory damages, consequential and incidental damages, actual damages, and lost profits, according to proof;

    B. Pre- and post-judgment interest;

    C. As the above-referenced conduct of Defendants was malicious, fraudulent, and oppressive, Plaintiff seeks punitive damages according to proof;

1    D. For costs of suit; and

2    E. Awarding such other and further relief as is deemed equitable,

3        appropriate, and just by this Court.

4

5                                    Respectfully Submitted,

6                                    HUGO PARKER, LLP

7

8    Dated:   June 11, 2020          By:_____

9                                    Edward R. Hugo
                                     Bina Ghanaat
10                                   Attorneys for Plaintiff
                                     MAXLITE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

1

## **JURY DEMAND**

2

Plaintiff hereby demands trial by jury.

3

4

Respectfully Submitted,

5

HUGO PARKER, LLP

6

7

Dated:   June 11, 2020                          By:

Edward R. Hugo

8

Bina Ghanaat

Attorneys for Plaintiff

9

MAXLITE, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States District Court, Central District Case No. _____*
*MaxLite, Inc. v. ATG Electronics, Inc. and David Wyatt*

1

2

3
## **VERIFICATION**

4
I, Zvi Raskin, certify as follows:

5
1.    I am General Counsel for MAXLITE, INC., the Plaintiff in this

6
action.

7
2.    I have read the foregoing VERIFIED CIVIL COMPLAINT in the

8
above-entitled action and know the contents thereof, and the same is true to

9
the best of my own knowledge and belief.

10
3.    I declare under penalty of perjury that the foregoing is true and

11
correct.

12
Executed on June 10, 2020.

13

14

15
_____

Zvi Raskin

16
MaxLite, Inc.

*General Counsel*

17

18

19

20

21

22

23

24

25

26

27

28

HUGO PARKER, LLP
240 STOCKTON ST, 8TH FLOOR
San Francisco, CA 94108

VERIFIED COMPLAINT

# EXHIBIT A



April 19, 2019

David Wyatt
11102 Bimini Drive
Santa Ana, CA 92705

Re:    Separation and Release Agreement

Dear Dave:

This letter agreement ("Agreement" or "letter agreement") sets forth the terms and conditions of your separation from employment with MaxLite, Inc. (the "Company") and your release of the Company from all claims, as more fully set forth below.

1.    **Termination of Employment**. Your employment with the Company shall terminate as of April 19, 2019 (the "Separation Date"). You do not claim nor shall you claim any further right to employment by the Company or its subsidiaries following the Separation Date.

2.    **Severance Payment**. If you sign and do not revoke this letter agreement, the Company shall pay you the aggregate gross amount of Thirty-Seven Thousand Five Hundred Dollars ($37,500), representing ten (10) weeks of your current Company salary, less social security, federal income tax and other normal withholdings and deductions. This payment will be paid to you in five (5) equal installments over the course of the five Company payroll dates following the Effective Date (as such term is defined in Section 19, below).

3.    **Accrued Vacation**. The Company will pay you the value of your accrued but unused vacation time, if any, as of the Separation Date, to the extent such is required by applicable law.

4.    **Health Insurance**. You and your eligible dependents shall have the right to elect continuation of health insurance coverage under the Company's Group Medical Plan, pursuant to COBRA, for the period specified by law.

5.    **Expenses**. The Company will reimburse you for any reasonable business expenses incurred by you prior to the Separation Date in accordance with Company policy and the submission by you to the Company of appropriate documentation. You are not authorized to incur any business expenses after the Separation Date.

6.    **No Further Amounts Owed**. By accepting the benefits provided for herein, including but not limited to the payment provided for in Section 2 above, you acknowledge and agree that the Company does not owe you any other or further amounts whatsoever, for any reason, except as expressly set forth in this letter agreement.

7.    **Release of All Claims**.

(a) Except as specified in this Agreement, you, on behalf of yourself and your family, agents, representatives, heirs, executors, trustees, administrators, successors and assigns (the "Releasors"), hereby irrevocably and unconditionally release, settle, cancel, acquit, discharge and acknowledge to be fully satisfied, and covenant not to sue the Company and each of its subsidiaries, affiliates, successors and assigns, and each of their respective

1

EXHIBIT A
Page 41

predecessors, stockholders, partners, members, directors, managers, officers, employees, agents or other representatives, and employee benefit plans of the Company (including current and former trustees and administrators of these plans) (collectively, the "Releasees") from any and all claims, contractual or otherwise, demands, costs, rights, causes of action, charges, debts, liens, promises, obligations, complaints, losses, damages and all liability of whatever kind and nature, whether known or unknown, and hereby waive any and all rights that he, she or it may have from the beginning of time up to and including the time of signing this letter agreement, or that otherwise may exist or may arise in respect of work performed before your employment, your employment or separation from employment with the Company, or is in any way connected with or related to any applicable compensatory or benefit plan, program, policy or arrangement, including, but not limited to, any claims arising under any federal, state, or local laws, including Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Equal Pay Act, the Americans with Disabilities Act of 1990, as amended, the Employee Retirement Income Security Act of 1974, as amended, the Workers Adjustment and Retraining Notification Act, the California Fair Employment and Housing Act, California Business and Professions Code, the California Constitution, the California Labor Code (including, without limitation, Section 132a), the California Civil Code and the California Family Rights Act, or any tort, contract, or alleged violation of any other legal obligation and any and all other federal, state or local laws, regulations, ordinances or public policies and any common law or equity claims, or claims under any policy, agreement, understanding or promise, written or oral, formal or informal, between the Company and any of its affiliates and yourself, now or hereafter recognized, including claims for wrongful discharge, slander and defamation, as well as all claims for counsel fees and costs. In addition, in consideration of the promises and covenants of the Company, you, on behalf of yourself and the other Releasers, further agree to waive any and all rights under the laws of any jurisdiction in the United States, or any other country, that limit a general release to any of the foregoing actions, causes of action, claims or charges that are known or suspected to exist in your favor as of the date you execute this letter agreement. IN THIS CONNECTION, YOU UNDERSTAND AND AGREE AS PART OF THE INDUCEMENT FOR THE CONSIDERATION GIVEN FOR THIS RELEASE THAT YOU ARE SPECIFICALLY WAIVING AND RELINQUISHING ALL RIGHTS AND BENEFITS AFFORDED BY THE PROVISIONS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH READS AS FOLLOWS:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

YOU ACKNOWLEDGE THAT YOU UNDERSTAND THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS HEREUNDER AND THIS WAIVER OF STATUTORY PROTECTION AGAINST THE RELEASE OF SUCH UNKNOWN CLAIMS. Anything to the contrary notwithstanding in this letter agreement, nothing herein shall release any Releasee from any claims and/or damages based on (a) any right or claim that arises after the date you execute this letter agreement pertaining to a matter that arises after such date, (b) any right you may have to pension benefits, health care or similar benefits pursuant to applicable law, (c) any right you may have to enforce this letter agreement or (d) any right you may have to be indemnified by the Company to the extent such indemnification is permitted by applicable law or the by-laws of the Company.

By signing this letter agreement and accepting the benefits provided, you agree that, except for any claims expressly excluded from this release, you will not hereafter pursue any

individual claims (whether brought by you, an administrative agency, or any other person on your behalf or which includes you in any class) against the Company or any other Releasee by means of a lawsuit, complaint, charge or otherwise, in any state or federal court or before any state or federal agency, including, by way of example and not limitation, the Equal Employment Opportunity Commission, the Department of Labor or any state Human Rights Agencies, for or on account of anything, whether known or unknown, foreseen or unforeseen, which has occurred up to the Effective Date of this letter agreement.

(b) ADEA Release. You hereby acknowledges that you are knowingly and voluntarily entering into this Agreement with the purpose of waiving and releasing any claims under the Age Discrimination in Employment Act of 1967 ("ADEA") and the Older Workers Benefit Protection Act ("OWBPA"), and as such, you acknowledge and agree that:

    (1)    this Agreement is worded in a clear and understandable way;

    (2)    any rights or claims arising under the ADEA and OWBPA are waived;

    (3)    claims under the ADEA and OWBPA that may arise after the date that you sign this Agreement are not waived;

    (4)    the rights and claims waived in this Agreement are in exchange for additional consideration over and above anything to which you were already entitled;

    (5)    you have been advised in writing to consult with an attorney prior to executing this Agreement, and have had an opportunity to do so;

    (6)    you have been given a period of time, 21 days, to consider this Agreement, and you understand that you may revoke your waiver and release of any ADEA (age discrimination) or OWBPA claims covered by this Agreement in the seven-day period following your execution of this Agreement; provided however, that such a revocation would be deemed to cause a failure of consideration for this Agreement, whereupon the Company would be entitled to a return of any monies that it may have paid to you under this Agreement; and

    (7)    Any changes made to this Agreement, whether material or immaterial, will not restart the running of this twenty-one (21) day period.

8.    **Confidential Information**. You agree and acknowledge that you will not (i) retain or use for the benefit, purposes or account of you or any other person, organization or entity; or (ii) disclose, divulge, reveal, communicate, share, transfer or provide access to any person, organization or entity other than the Company: any non-public, proprietary or confidential information -- including, without limitation, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, employees, consultants, vendors, suppliers, compensation, benefits, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals -- concerning the past, current or planned business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis ("Confidential Information") without the prior written authorization of the Company. Confidential Information shall not include any information that is (a) generally known to the industry or the public other than as a result of your breach of this covenant or any breach of other confidentiality obligations by third parties; (b) made legitimately available to you by a third party without breach of any confidentiality obligation; or (c) required by law to be disclosed; provided that you shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and cooperate with any attempts by

<div align="center">3</div>

the Company to obtain a protective order or similar treatment.

9.      **Non-Solicitation of Company's Employees and Agents**. You agree that, for a period of one year following the Separation Date, you shall not employ or solicit for employment, or assist another in employing or soliciting for employment, any person who is then, or was at any time following the Separation Date, an employee, consultant or agent of the Company.

10.      **A Claim of Breach by the Company Not a Defense**. The provisions of Paragraphs 8 and 9 are, and shall be construed as, independent covenants, and no claimed or actual breach of any contractual or legal duty by the Company shall excuse or terminate your obligations under this Agreement or preclude the Company from obtaining injunctive relief, or damages, for your violation, or threatened violation, of any of those provisions.

11.      **Remedies.** You acknowledge that this Agreement, its terms and your compliance are necessary to protect the Company's Confidential Information (as defined above), its business and its goodwill; and that a breach of any of your promises contained in this Agreement will irreparably and continually damage the Company to an extent that money damages may not be adequate to address. For these reasons, you agree that in the event of a breach or threatened breach by you of this Agreement, the Company shall be entitled to a temporary restraining order and preliminary injunction restraining you from such breach. Nothing contained in this provision shall be construed as prohibiting the Company from pursuing any other remedies available for such breach or threatened breach or any other breach of this Agreement. You also agree to pay all reasonable attorneys' fees and court costs, if any, incurred by the Company in attempting to enforce the terms of this Agreement, including without limitation, attorneys' fees and costs incurred before the Company resorts to an action in Court.

12.      **Return of Property**. On the Separation Date, you agree to return to the Company all of the following items: (i) all equipment provided to you for your use in connection with your employment by the Company, including your computer and cellphone, without deleting or erasing any Company information stored thereon; (ii) all hard copy and/or electronic documents in your custody or control, including but not limited to any electronic documents stored on your personal computers or devices, concerning the Company or its business; (iii) all passwords, account numbers, log-in information, keys and access passes to or for Company facilities, accounts, property, vendors, services and/or software, that are in your custody or control; and (iv) any credit card issued or provided to you by the Company. You agree not to access or allow any other individuals to access the Company's computer and information systems following your Separation Date.

13.      **Consideration**. The consideration provided to you hereunder is not required by law, Company policy or otherwise, and you know of no other circumstances other than your agreeing to the terms of this letter agreement that would require the Company to provide such consideration.

14.      **Termination of Payments/Benefits**. If you do not sign and return this letter agreement in a timely fashion, or if you revoke such signature, or if you fail to abide by any of the terms of this letter agreement, the Company may, without waiving the releases granted by you herein, terminate any remaining payments or benefits that would otherwise be due hereunder.

15.      **Legal Advice, Reliance.** You represent and acknowledge: (i) that you have been allowed adequate time, of at least twenty-one (21) calendar days, to consider this letter agreement (which, by signing this letter agreement prior to the expiration of such period, you have expressly agreed to waive); (ii) that you have been advised to consult with an attorney, and discuss all aspects of this letter agreement, before you decide whether to sign it; (iii) that you have carefully read and fully understand all the provisions of this letter agreement; (iv) that you have voluntarily entered into this letter agreement, without any pressure, duress or coercion; and (v) that you have not previously assigned or transferred or purported to assign or transfer, to any person or entity, any of the claims described in Section 7 hereof, any portion

4

thereof, or any interest therein.

16.     **Non-Disclosure of this Agreement**. By signing this Agreement, you represent that you have not disclosed, and agree not to disclose in the future, any of its terms to any person at any time, provided that this paragraph shall not be construed to prohibit such disclosure as may be required by law, or in a proceeding to enforce the terms and conditions of this Agreement, or pursuant to your professional obligations.

17.     **References**. In the event that the Company's Human Resources department receives an inquiry concerning your employment at the Company, the Company shall only confirm your position, dates of employment and compensation. The Company is not responsible for reference inquiries that are not directed to its Human Resources department.

18.     **Miscellaneous**.

a. No Violation of Law. You and the Company agree and acknowledge that this letter agreement is not and shall not be construed to be an admission by either party of any violation of any federal, state or local statue, ordinance or regulation or of any duty owed by either party to the other.

b. Third Party Beneficiaries. All Releasees under this letter agreement who are not signatories to this letter agreement shall be deemed to be third party beneficiaries of this letter agreement to the same extent as if they were signatories hereto.

c. Entire Agreement. This letter agreement constitutes the sole and complete understanding of you and the Company with respect to the subject matter hereof. Except to the extent expressly provided in this letter agreement, upon execution and delivery of this letter agreement, all prior agreements, plans, programs, understandings and arrangements are hereby terminated, and you, and the Company and its subsidiaries and affiliates, are fully, completely, irrevocably and forever discharged from any and all obligations set forth therein, pursuant thereto or arising therefrom. You and the Company represent to each other that in executing this letter agreement, you and the Company do not rely and have not relied upon any representation or statement not set forth herein made by any other person, with regard to the subject matter, basis or effect of this letter agreement.

d. Amendment; Waiver; Successors. No amendment, modification or alteration of the terms and provisions of this letter agreement shall be binding unless the same shall be in writing and duly executed by you and the Company. No waiver of any of the provisions of this letter agreement shall be deemed to or shall constitute a waiver of any other provision hereof. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof. This letter agreement shall be binding upon the parties hereto and their respective successors, transferees and assigns.

e. Electronic Signature. The parties agree to accept facsimile, scanned and copied signatures of this letter agreement as original signatures for all purposes and further agree to accept copied, scanned, electronic, and printed versions of this letter agreement which are fully signed as if it were an original.

f. Governing Law; Severability. This letter agreement will be governed by the laws of the State of New Jersey, without regard to its conflict of laws rules. In the event that any one or more of the provisions of this letter agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby. The parties hereto agree that the covenants set forth in this letter agreement are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants as to the court shall appear not reasonable and to enforce the remainder of these covenants as so amended.

5

g. Assignment. This letter agreement may not be assigned by either Party, except that the Company may assign its rights and obligations under this Agreement in connection with a sale of all or a substantial part of its business or assets to which such rights and obligations pertain.

19.     **Revocation Period**. To accept the terms of this letter agreement, please date and sign this letter and return it to Barbara Ottinger, MaxLite's Director of Human Resurces, within twenty-one (21) days. Once you do so, you will still have seven (7) additional days from the date you sign to revoke your acceptance ("revocation period"). If you decide to revoke this letter agreement after signing and returning it, you must send a written and signed statement of revocation to Ms. Ottinger by fax, electronic mail, or registered mail. To be effective, the written revocation must be received by Ms. Ottinger no later than 5:00 pm New Jersey time on the seventh (7th) day after you have executed and returned this letter agreement. You understand that if you revoke this letter agreement, you will not be entitled to any payments or benefits hereunder. If you do not revoke during the seven-day revocation period, this letter agreement will take effect on the eighth (8th) day after the date you the sign it (the "Effective Date").

20.     **Questions for MaxLite.** If you have any questions which you wish to ask of the Company, please direct them to Ms. Ottinger.

Thank you and much future success.

Very truly yours,

MAXLITE, INC.

By:     Spencer Bolgard
Title: President

This letter agreement is Acknowledged and Agreed to in its Entirety on this __22__ day of __April__, 2019

David Wyatt

6

# EXHIBIT B

| | |
|---|---|
| **Subject:** | Re: Re: LED light opportunity |
| **From:** | Nickn (nickn@atgelectronics.com) |
| **To:** | davidwyatt7923@att.net; |
| **Cc:** | lobbydive@yahoo.com; |
| **Date:** | Wednesday, August 7, 2013 9:15 AM |

David, James,

I would like to meet and talk tomorrow, Thursday evening, we can have dinner together after work, are you available?

Let's work on this, don't let it slip by.

———

Nick



Nick Ni
倪亚西

**ATG ELECTRONICS**

**From:** David Wyatt
**Date:** 2013-08-05 03:55
**To:** nickn
**CC:** james steedly
**Subject:** Re: LED light opportunity

Dear Nick,

It was my pleasure to meet with you last week. This is clearly an exciting time in the lighting business because of the LED revolution. I agree with your opinion that a team effort, with everyone doing their part, is the best course. Quick, decisive action is required because time is ticking and their is tough competition.

I will be traveling Monday and Tuesday but I think we should talk further. Let's put another date on the books to sit down without time limitations so we can talk at length about the various elements. I would like to hear more about equity positions and how we would take the Company to the investment community when we reach the designated annual revenue.

EXHIBIT 2
1/2

Print

Best Regards,

Dave

David Wyatt, VP Sales C&I West
Cell 323-633-3143
Dwyatt@maxlite.com
Sent from my iPad

On Aug 4, 2013, at 11:09 AM, Nickn <nickn@atgelectronics.com> wrote:

David, James,

Thank you for taking time coming out for the lunch meeting.

We have great opportunity for LED lighting in the next few years, and we can make it very big if we act
decisively.

Good business is about putting together a good team, and each member handle what he can do best, then
collectively the team produces the best outcome.

If you guys join me, handling US product and sales, I focus on handling supply side, we can make the
company to the $50 million range and take it to NASDAQ in a few years. As original share holders, we
can gain real financial freedom. We can package good assests, like factories and land, into this to make it
happen quicker.

I saw similar oportunities in the computer business in the 1990s but did not quite make it; today I look
back and regret much of that.

I will make it in this LED lighting business,. I see you guys as very good partners for this business. Let's
think on it and see if a good arrangement can be made, and we act on it when we all see time is right.

Nick
951 310 9730

<16148_image001(06-04-09-10-13).jpg> Nick Ni

EXHIBIT 2
1/2

EXHIBIT B
Page 49

# EXHIBIT C

EXHIBIT C
Page 50

Print

| | |
|---|---|
| **Subject:** | Our meeting |
| **From:** | Nickn (nickn@atgelectronics.com) |
| **To:** | davidwyatt7923@att.net; |
| **Cc:** | lobbydive@yahoo.com; |
| **Date:** | Sunday, August 11, 2013 5:51 PM |

David,

It is great we met yesterday, went over all the main ideas, and came to some basic understanding.

This will be a great match for all of us, and I am sure we will go from doing good today to some outstanding achievements in a few years.

I will make sure you guys start with at least the same current level of annual income, and increase quickly by profit sharing.

The main thing we will shoot for is possible sale of shares, either by IPO to the public, or to future private investors in the near future.

Please have yor contract checked out; making the move at end of 2013 or beginning of next year would be great timing.

For high valuation of shares, we will pack together the China factories and US distribution, which in fact is one now and under my control.

It would be very good if you tour China in October, see the factories and meet my staff and my partner, who is my college buddy and is arranging cash injection into this operation. His investment company will be holding 50% of shares of the whole package after we re-do the structure, because, besides work capital, they will put in the land and building of the new factory, which is very high quality fixed assets and is worthy many millions of dollars; but they will not involve in our operation.

Our sales will be around $10 million for 2013, I want to get to over $30 million in two years; we will need to raise about $5 million or so within next year so we will have about $10 million work capital to support that sales level. The fund raise is in the pipeline already. Stronger US team and higher sales would help greatly.

I will be leaving for China in two weeks and we can meet again before that. Meanwhile, please mail or call any time if you want to talk.

Nick

**EXHIBIT 3** 1/2

EXHIBIT C
Page 51

8/28/2015                                              Print



**Nick Ni**
倪亚西

**ATG ELECTRONICS**

EXHIBIT 3
1/2

EXHIBIT C
Page 52

# EXHIBIT D

Case 8:20-cv-01056-MCS-ADS Document 1 Filed 06/11/20 Page 54 of 65 Page ID
Case 8:18-cv-01106-JVS-JBC Document 202-1 Filed 06/13/18 Page 97 of 149 Page ID #:4338
#:54

8/28/2015                                              Print

| Subject: | Re: Re: LED light opportunity |
| From: | Nickn (nickn@atgelectronics.com) |
| To: | davidwyatt7923@att.net; |
| Cc: | lobbydive@yahoo.com; |
| Date: | Wednesday, September 4, 2013 5:47 PM |

Thanks, Dave.

<br>

**Nick Ni**
倪亚西

**ATG ELECTRONICS**

From: David Wyatt
Date: 2013-09-04 21:54
To: nickn
CC: james steedly
Subject: Re: LED light opportunity

Hi Nick,

I signed the retainer and send the check for $1500 to New Jersey. I received confirmation that they received the check, which they cashed, and they promised to send me their opinion as soon as possible. So right now I'm just waiting to get a response from the New Jersey perspective, which we will then combine with the California law. I will let you know the minute I hear anything.

I hope all is going well for you. We will look forward to seeing you in October.

Dave

David Wyatt, VP Sales C&I West
Cell 323-633-3143
Dwyatt@maxlite.com
Sent from my iPad

On Sep 3, 2013, at 6:17 PM, Nickn <nickn@atgelectronics.com> wrote:

David,

Did John Brink finish review your contract? Can you please forward me his findings?

I am planning to come to California in October.

Thank you.

Nick

Nick Ni

EXHIBIT 4

EXHIBIT D
Page 54

&lt;16148_image001(06-04-09-10-13).jpg&gt; 倪亚西

**From:** David Wyatt
**Date:** 2013-08-24 01:04
**To:** nickn
**CC:** james steedly
**Subject:** Re: LED light opportunity

Hi Nick,

I hope you are having safe travels back to your home base.

Thank you so much for your time and discussion of the business opportunity. I understand your logic and the element of combining the two enterprises when the time is right.

I will look for the check and will hopefully have something soon that I can report back to you. In the meantime, I will continue positive thinking about the future.

Best Regards,

Dave

David Wyatt, VP Sales C&I West
Cell 323-633-3143
Dwyatt@maxlite.com
Sent from my iPad

On Aug 22, 2013, at 9:06 AM, Nickn &lt;nickn@atgelectronics.com&gt; wrote:

David,

I am having a check mailed to your address today, lets get the opinion from the New Jersey lawyers first.

I talked about issuing you California stock simply because it is easy and simple to start, not because we don't want you have ownership of the China operation. I have always said we need to combine these two sides to get the value for future investors, either public or private. The next thing we do will be something like a stock swap between the two companies. When we go IPO, it will be the whole package; we can't go with either side separately.

At less than $10 million, our sales is small today, that is why we need you guys come in and help. And that is where the opportunity is for you. Building up something from small to large and share the benefits, that is the point. Bigger companies will not offer this kind of deal to anyone.

If you choce to stay where you are, it seems safe, stable, and a high rank managerial position in a mid size company; the other one would seem bold, risk taking, but the outcome will likely be a proud owner and operator of a large LED lighting company, with continuous growth in energy saving product business.

This is a big decision, critical choice, lets proceed with no hurry, take our time, look around, think thoroughly.

Nick
9513109730

**EXHIBIT 4**

EXHIBIT D
Page 55

8/26/2015                                    Print

<16148_image001(06-04-09-10-13).jpg> Nick Ni

发件人： David Wyatt
发送时间： 2013-08-22 07:04
收件人： nickn@atgelectronics.com
主题： Re: 答复： Re: 答复： Re: Re: LED light opportunity

Nick,

What was the name or cross street? Please call or text. thanks.

David Wyatt, VP Sales C&I West
Cell 323-633-3143
Dwyatt@maxlite.com
Sent from my iPad

On Aug 20, 2013, at 9:25 AM, nickn@atgelectronics.com wrote:

>
> David,
>
>
> I should have it on my computer now, the file is too big for my blackberry, I saw the message.
>
> Tomorrow 4:30 pm at the Chinese place we went to last time?
>
>
> Nick
>
> Nickn
>
> -----Original Message-----
> From: David Wyatt <davidwyatt7923@att.net>
> Date: Tue, 20 Aug 2013 12:15:32
> To: nickn@atgelectronics.com<nickn@atgelectronics.com>
> Subject: Re: 答复： Re: Re: LED light opportunity
>
> Nick,
>
> I just sent my agreement to you under a different email. Please confirm receipt.
>
> Thanks,
>
> Dave
>
> David Wyatt, VP Sales C&I West
> Cell 323-633-3143
> Dwyatt@maxlite.com
> Sent from my iPad
>
> On Aug 20, 2013, at 4:55 AM, nickn@atgelectronics.com wrote:
>

**EXHIBIT 4**

Case 8:20-cv-01056-MSS-CADS Document 1 Filed 06/1/20 Page 57 of 65 Page ID
Case 1:20-cv-01056-JMS-JBC Document 262-1 Filed 06/03/18 Page 20 of 149 PageID #341
#:57

>>

>> Ok, nice.

>>

>>

>> Nickn

>>

>> -----Original Message-----

>> From: james steedly <lobbydive@yahoo.com>

>> Date: Mon, 19 Aug 2013 22:38:23

>> To: nickn<nickn@atgelectronics.com>; davidwyatt7923<davidwyatt7923@att.net>

>> Reply-To: james steedly <lobbydive@yahoo.com>

>> Subject: Re: Re: LED light opportunity

>>

>> hello Nick

>>

>> yes

>> David and I will meet with you for dinner Wednesday around 430 I will text the location , but I think the Chinese restaurant will be fine .

>>

>>

>> thank you

>>

>> james

>>

>>

>>

>> _____

>> From: Nickn <nickn@atgelectronics.com>

>> To: davidwyatt7923 <davidwyatt7923@att.net>

>> Cc: james steedly <lobbydive@yahoo.com>

>> Sent: Monday, August 19, 2013 2:47 PM

>> Subject: Re: Re: LED light opportunity

>>

>>

>>

>> David, James,

>>

>>

>> I will be leaving for China this Friday morning, can we meet Wednesday

>> after work? Or Tuesday after work?

>>

>>

>> Please let me know.

>>

>>

>>

>> Nick

>>

>>

>>

>>

>>

>> _____

>>

>> Nick Nl

EXHIBIT 4

1/5

8/26/2015                                              Print

>> 倪亚西
>
>

**EXHIBIT 4**
5/5

EXHIBIT D
Page 58

# EXHIBIT E

Case 2:20-cv-01056-MCS-ADS   Document 7   Filed 06/01/20   Page 60 of 65   Page ID
Case 2:15-cv-01116-JMV-JBC   Document 87   Filed 08/20/19   Page 1 of 3 PageID: 3945
#:60

# JASINSKI

A PROFESSIONAL CORPORATION | COUNSELORS-AT-LAW

www.jplawfirm.com

August 20, 2019

**VIA CM/ECF**
Hon. James B. Clark, III, U.S.M.J.
United States District Court – District of New Jersey
US Post Office & Courthouse Building
1 Federal Square
Courtroom MLK 2A
Newark, NJ  07102

      **RE:**   **MaxLite, Inc. v. ATG Electronics, Inc., et al.**
             **Civil Action No. 2:15-CV-01116-JMV-JBC**

Dear Magistrate Clark:

      This office represents the interests of ATG Electronics, Inc. ("ATG").  We write this letter in response to Plaintiff MaxLite, Inc.'s ("MaxLite") request for permission to file a motion to compel discovery in this matter.

      MaxLite's recent request is just another example of Plaintiff's scorched earth litigation tactics.  ATG has properly responded to all of MaxLite's discovery demands.  The crux of MaxLite's complaint is that it does not believe that it has received all communications by and between ATG and its former employees, and it believes that ATG is doing business with one of its sales' representatives, Blanchard Associates, an entity identified on Plaintiff's Schedule A to its document demand.

      The Employee Defendants have been gone from ATG's employ since June 30, 2015; over four years.  ATG has produced all communications with any former employees of MaxLite through February of this year.  ATG has also produced all sales information in its possession with respect to the 89 entities listed on Plaintiff's Schedule A through March 2019; despite the fact that MaxLite has not provided any proof that it does business with the vast majority of the entities on the list.

      Blanchard Associates, is a company that sells products of various competitors in connection with jobs.  Its primary clients would be contractors.  David Wyatt may have recently communicated with Blanchard about ATG products. However, David Wyatt is not an employee of ATG and is not on ATG's payroll. Thus, ATG would not be in possession of these communications. Moreover; communications occurring in excess of four years after the departure of the employee defendants is irrelevant to this litigation.

      MaxLite's request for information regarding David Wyatt strains credulity, given that: they fired David Wyatt in April of 2019, and released Mr. Wyatt from any obligations he had to

---

60 Park Place, 8th Floor
Newark, NJ 07102
ph 973-824-9700  |  fax 973-824-6061

308 South New York Road, Suite B
Galloway, NJ 08205
ph 609-677-9800  |  fax 609-677-9811

EXHIBIT E
Page 60

Hon. James B. Clark, III, U.S.M.J.\
August 20, 2019
Page 2

MaxLite with respect to any restrictive covenants or other employment contracts that he may be a party to. Specifically, MaxLite and Mr. Wyatt entered into a severance and release agreement which provides in paragraph 18 that "except for the extent expressly provided in this letter agreement, upon execution and delivery of this letter agreement, all prior agreements, plans, programs, understandings and arrangements are hereby terminated and **you** and the Company and its subsidiaries and affiliates are fully completely irrevocably and forever discharged from any and all obligations set forth therein pursuant thereto or arising therefrom."

On May 15, 2019, MaxLite confirmed in writing that pursuant to Paragraph 18(c) of the severance and release agreement, David Wyatt was no longer bound to his non-compete agreement; and that he had returned all of MaxLite's company property. A copy of the email is attached hereto. After Mr. Wyatt was let go and entered into a severance agreement, Mr. Wyatt contacted ATG to advise that his services with MaxLite had been terminated and he had been released from his restrictive covenant. Prior to his discharge, ATG had no communications with him. He has formed his own corporation and sells ATG products, and presumably the products of others through his corporation.

This lawsuit is not about David Wyatt and more importantly, MaxLite discharged him from any obligations he may have had under a restrictive covenant agreement, and ATG does not employ him. MaxLite has no legitimate reason to review correspondence that occurred subsequent to his discharge by and between Mr. Wyatt and ATG.

Respectfully submitted,

JASINSKI, P.C.

SUSAN BURNS

SB/msg
Encl.
cc: All Counsel of Record (via CM/ECF)

---

**JASINSKI**

**From:** Barbara Ottinger <bottinger@maxlite.com>
**Date:** May 15, 2019 at 12:19:56 PM PDT
**To:** "davidwyatt7923@att.net" <davidwyatt7923@att.net>
**Subject: RE: D Wyatt - Questions Related to "Separation and Release Agreement" 051519**

Dave – please see responses below.

Barbara Ottinger
Director of Human Resources

**From:** davidwyatt7923@att.net [mailto:davidwyatt7923@att.net]
**Sent:** Wednesday, May 15, 2019 1:28 PM
**To:** Barbara Ottinger <bottinger@maxlite.com>
**Subject: D Wyatt - Questions Related to "Separation and Release Agreement" 051519**
**Importance:** High

Dear Ms. Ottinger:

I need to have certain resolution on two key issues contained in the Separation Agreement I signed on 4/22/19.

> Item 12       I need written confirmation that you received my computer and cell phone as required in item 12, and that I have complied with all aspects of item 12 **"Return of Property"** – I have received all company property

> Item 18(c)       I need written confirmation that the following verbiage in 18c specifically and formally releases me from all my previous non-compete agreements, and all relate agreements, with the company: - **You are no longer bound to a non-compete agreement.**
>
> *"all prior agreements, plans, programs, understandings, and arrangements are hereby terminated, and you, and the Company and its subsidiaries and affiliates, are fully, completely, irrevocably and forever discharged therein, pursuant thereto and arising therefrom."*

I would appreciate a response to this request at your earliest possible convenience.

Sincerely,

David Wyatt
Cell 714-330-9895
Email davidwyatt7923@att.net

# EXHIBIT F

| | |
|---|---|
| **From:** | davidwyatt7923@att.net |
| **Sent:** | Wednesday, May 15, 2019 1:14 PM |
| **To:** | Barbara Ottinger |
| **Subject:** | RE: D Wyatt - Questions Related to "Separation and Release Agreement" 051519 |

Thank you Barbara for your fast response. That was my understanding as well but my counselor felt we should get it in writing.

David Wyatt
Cell 714-330-9895
Email davidwyatt7923@att.net

**From:** Barbara Ottinger <bottinger@maxlite.com>
**Sent:** Wednesday, May 15, 2019 12:20 PM
**To:** davidwyatt7923@att.net
**Subject:** RE: D Wyatt - Questions Related to "Separation and Release Agreement" 051519

Dave – please see responses below.

**Barbara Ottinger**
Director of Human Resources

**From:** davidwyatt7923@att.net [mailto:davidwyatt7923@att.net]
**Sent:** Wednesday, May 15, 2019 1:28 PM
**To:** Barbara Ottinger <bottinger@maxlite.com>
**Subject:** D Wyatt - Questions Related to "Separation and Release Agreement" 051519
**Importance:** High

Dear Ms. Ottinger:

I need to have certain resolution on two key issues contained in the Separation Agreement I signed on 4/22/19.

Item 12    I need written confirmation that you received my computer and cell phone as required in item 12, and that I have complied with all aspects of item 12 **"Return of Property" – I have received all company property**

Item 18(c)    I need written confirmation that the following verbiage in 18c specifically and formally releases me from all my previous non-compete agreements, and all relate agreements, with the company: - **You are no longer bound to a non-compete agreement.**

*"all prior agreements, plans, programs, understandings, and arrangements are hereby terminated, and you, and the Company and its subsidiaries and affiliates, are fully, completely, irrevocably and forever discharged therein, pursuant thereto and arising therefrom."*

I would appreciate a response to this request at your earliest possible convenience.

Sincerely,

David Wyatt
Cell 714-330-9895

EXHIBIT F
Page 64

Email davidwyatt7923@att.net

2

EXHIBIT F
Page 65